278 Neb. 466
STATE OF NEBRASKA, APPELLEE,
v.
JOHN L. LOTTER, APPELLANT.
Nos. S-08-449, S-08-450, S-08-451
Supreme Court of Nebraska.
Filed September 4, 2009.
Andre R. Barry, of Cline, Williams, Wright, Johnson & Oldfather, L.L.P., for appellant.
Jon Bruning, Attorney General, and J. Kirk Brown for appellee.
HEAVICAN, C.J., CONNOLLY, GERRARD, STEPHAN, and McCORMACK, JJ., and INBODY, Chief Judge, and CARLSON, Judge.
McCORMACK, J.

I. NATURE OF CASE
John L. Lotter was convicted of three counts of first degree murder and sentenced to death. The evidence at trial was that Thomas M. Nissen, also known as Marvin T. Nissen, and Lotter planned the murders together, but Nissen testified that it was Lotter who actually killed the victims. Fourteen years after the crimes were committed, Nissen signed an affidavit stating that he committed perjury at Lotter's trial and that he, not Lotter, actually killed the victims. Lotter appeals from the district court's order denying his second pro se motion for postconviction relief.

II. BACKGROUND
In May 1995, Lotter was convicted of three counts of first degree murder, three counts of use of a weapon to commit a felony, and one count of burglary in connection with the December 1993 deaths of Teena Brandon, Lisa Lambert, and Phillip DeVine in Richardson County, Nebraska. Lotter was sentenced to death for each count of first degree murder and to incarceration on the burglary and use of a weapon convictions.
Before Lotter's trial, Nissen was convicted in a separate trial of first degree murder in the death of Brandon and second degree murder in the deaths of Lambert and DeVine.[1] While Nissen's sentencing hearing was pending, Nissen entered into a plea agreement with the State. The agreement provided that Nissen would testify truthfully against Lotter at Lotter's trial and that, in exchange, the State would not pursue the death penalty against Nissen for Brandon's murder.
At Lotter's trial, Nissen testified that he and Lotter traveled to Lambert's house, where they knew Brandon was staying, in order to kill Brandon. Nissen and Lotter had previously raped Brandon, and they were angry that she had reported the rape to the police. Nissen testified that he and Lotter agreed they would also kill anyone else they found there. Nissen testified that he stabbed Brandon, but that Lotter fired the shots that killed all three victims.
In addition to Nissen's testimony, other evidence at trial established that on the night of the murders, Lotter stole the gun used to murder the victims and that Lotter obtained the knife and the yellow work gloves worn during the crimes. Just before the killings, both Nissen and Lotter were seen wearing gloves. The evening of the murders, Lotter told a witness he wanted to kill someone. And after the murders, Nissen and Lotter sought to obtain alibis from Nissen's wife and Lotter's girlfriend. Finally, there was evidence indicating that Lotter had traveled to Lincoln, Nebraska, looking for Brandon in order to murder her.
Lotter testified in his own defense and denied any participation in either the planning or the perpetration of the murders. Lotter stated he was not present when the murders were committed. He testified that Nissen had not been truthful in his testimony regarding Lotter's involvement in the crimes and that other witnesses who gave incriminating testimony against him were either lying or mistaken.
In sentencing Lotter to the death penalty, the sentencing panel found the following aggravating circumstances to be applicable. For Lambert and DeVine, the panel found in each case that "`[t]he murder was committed in an apparent effort. . . to conceal the identity of the perpetrator of a crime'"[2] and that "`[a]t the time the murder was committed, the offender also committed another murder.'"[3] As to the murder of Brandon, the panel found that at the time the murder was committed, the offender also committed another murder[4] and that "`[t]he crime was committed to disrupt or hinder . . . the enforcement of the laws.'"[5]
When comparing Lotter's and Nissen's participation in the homicides, the sentencing panel stated that the evidence, based largely upon Nissen's testimony, was that Lotter fired all the shots that killed the three victims. But the panel explained that even if it was Nissen, and not Lotter, who actually killed Brandon by stabbing her, "there is no appreciable difference in degree of culpability between these Co-Defendants during the actual commission of the homicides."[6] In comparing the actions of Nissen and Lotter after the commission of the crimes, however, the sentencing panel stated that Nissen's statements to investigators, as well as Nissen's agreement to testify against Lotter at trial, distinguished his conduct from Lotter's.
Lotter's convictions were affirmed on direct appeal.[7] Lotter then moved for postconviction relief, was appointed counsel, and was granted an evidentiary hearing in 1999. In this motion, Lotter alleged that Nissen, not Lotter, had shot and killed the three victims and that the State knew or should have known Nissen's testimony was perjured. In support of this assertion, Lotter relied on an affidavit of Jeff Haley, an inmate incarcerated with Nissen. Haley averred that Nissen told him that he had fired the shots and that, as Nissen shot the victims, Lotter was "`freaking out and running around,'" saying "`What are you doing?'"[8] According to Haley, Nissen stated that he should have shot Lotter as well and then there would have been no witnesses. Lotter also filed a motion for writ of error coram nobis and a motion for new trial based on the statements allegedly made by Nissen to Haley.
At the evidentiary hearing, Nissen pled the Fifth Amendment and refused to answer any questions. The district court concluded that Haley's testimony as to what Nissen had allegedly said to him was inadmissible hearsay. And the district court found that the inadmissible hearsay did not fall within the penal interest exception to the hearsay rule,[9] because there were no corroborating circumstances clearly indicating the trustworthiness of the testimony.[10]
Having no admissible evidence before it to support Lotter's claims, the district court denied all relief, and we affirmed. We agreed that the district court properly excluded Haley's testimony and that thus, such statements could not form the basis of any claim that Nissen's trial testimony was perjured. Since Lotter failed to present any other evidence that was unavailable during direct appeal that could show the State knew Nissen's testimony was perjured, we held that the court properly denied postconviction relief. For similar reasons, we concluded that the court was correct to deny Lotter's motions for new trial and writ of error coram nobis.
In 2001, Lotter filed a pro se motion for postconviction DNA testing pursuant to the DNA Testing Act.[11] Evidence at Lotter's trial had indicated that the yellow work gloves worn by Nissen at the time of the crime contained two areas that tested positive for blood. The blood had never been subjected to DNA testing. Lotter claimed that if the blood on the gloves and other clothing worn by Nissen that night was shown to be caused by high-velocity blood spatter from Brandon, as opposed to blood from stabbing, or if the blood was shown to be from Lambert and/or DeVine, then it would establish that Nissen was not in the locations he testified he was in during the crime and that Nissen was the shooter, not Lotter.
We upheld the district court's decision to deny the motion.[12] We explained that there would be no way to establish the manner in which the blood had been deposited on the clothing, as opposed to whose blood it was. And since there was any number of ways in which the victims' blood could have been deposited on Nissen's clothing during the crime, whose blood it was would not be probative of whether Nissen was the shooter. Thus, the testing would not result in noncumulative, exculpatory evidence relevant to the claim that he was wrongfully convicted, as required by the DNA Testing Act.[13]
We also rejected Lotter's claim that the DNA evidence could produce noncumulative, exculpatory evidence relevant to the claim that Lotter was wrongfully sentenced, explaining: "As the sentencing panel correctly concluded, the record is barren of any evidence that Lotter was merely an accomplice or that his participation was relatively minor. There was no appreciable difference in the degree of culpability between Nissen and Lotter during the actual commission of the murders."[14] And we stated, again, that the presence of the victims' DNA on the items sought to be tested would not be inconsistent with Nissen's testimony and could not indicate whether Lotter was the shooter.[15]
In 2007, Nissen signed an affidavit averring that his testimony in Lotter's trial regarding "who fired the gun" was false. Nissen stated that he, and not Lotter, shot Brandon, Lambert, and DeVine. Nissen did not recant any other portion of his testimony concerning Lotter's involvement in the murders.
Lotter then filed a second pro se motion for postconviction relief, which is the subject of this appeal. The second postconviction motion alleged that Nissen was a critical witness for the State and that during Lotter's trial, Nissen "testified falsely that it was [Lotter] who conceived the idea of killing Lambert, Brandon, and DeVine, and that [Lotter] shot all three of them."
Lotter alleged that his constitutional rights were violated because the State knew or should have known that Nissen was lying at trial. In particular, Lotter alleged that the State was in possession of evidence that Nissen was a "`world class liar'" and a "`con artist.'" In particular, the State was aware of a prior, unrelated incident in which it was documented that Nissen had lied to authorities. The motion further alleged that the State had asked Nissen to take a polygraph test in connection with the plea agreement, but that Nissen had refused. This information indicating Nissen's reputation as a liar was allegedly withheld from Lotter "until after the conclusion of his trial."
Citing Ortega v. Duncan,[16] Lotter also asserted that the State's use of Nissen's perjured testimony, regardless of its knowledge that it was perjured, violated Lotter's constitutional rights because without Nissen's testimony, Lotter "most likely would not have been convicted or sentenced to death."
Finally, citing Brown v. Mississippi,[17] Lotter asserted that the use of Nissen's testimony violated Lotter's constitutional rights because Nissen's testimony was procured by threat of death by electrocution, a punishment this court has deemed cruel and unusual in State v. Mata.[18]
Attached to the second motion for postconviction relief was Nissen's affidavit, the aforementioned affidavit of his cellmate Haley, statements to police by a family member describing Nissen as a liar, and police reports relating to an incident in 1989 where Nissen cut himself with a razor and blamed someone else so the accused would get arrested. Also attached was a newspaper article detailing Nissen's previous run-ins with the police and descriptions of Nissen's reputation as a liar. The district court concluded that no evidentiary hearing was warranted by any of the allegations made by Lotter, and Lotter appeals.

III. ASSIGNMENTS OF ERROR
Lotter asserts that the district court erred in failing to grant him a new trial or, at a minimum, hold an evidentiary hearing to determine (1) whether Nissen gave perjured testimony at Lotter's trial and (2) whether the prosecution knew or should have known about Nissen's perjury at the time of Lotter's trial. Lotter asserts that the district court also erred in not granting postconviction relief on the ground that his testimony was coerced by the threat of cruel and unusual punishment.

IV. STANDARD OF REVIEW
[1] Whether a claim raised in a postconviction proceeding is procedurally barred is a question of law.[19]
[2] The determination of whether the procedures afforded an individual comport with constitutional requirements for procedural due process presents a question of law.[20]

V. ANALYSIS
[3-5] States are not obligated to provide a postconviction relief procedure.[21] Nevertheless, the Nebraska Postconviction Act[22] provides a defendant in custody with a civil procedure by which, "at any time," the defendant can present a motion alleging "there was such a denial or infringement of the rights of the prisoner as to render the judgment void or voidable under the Constitution of this state or the Constitution of the United States."[23] Although there is no time limit to bringing the motion, postconviction relief under § 29-3001 is a very narrow category of relief, available only to remedy prejudicial constitutional violations.[24] Absent a factual circumstance whereby the judgment is void or voidable under the state or U.S. Constitution, the court has no jurisdiction to grant postconviction relief.[25]
[6] An evidentiary hearing on a motion for postconviction relief is required on an appropriate motion containing factual allegations which, if proved, constitute an infringement of the movant's rights under the Nebraska or federal Constitution.[26] But, this court has consistently required that a defendant make specific allegations instead of mere conclusions of fact or law in order to receive an evidentiary hearing for postconviction relief.[27] And postconviction relief without an evidentiary hearing is properly denied when the files and records affirmatively show that the prisoner is entitled to no relief.[28]

1. ALLEGED PERJURED TESTIMONY
Lotter's primary focus for this postconviction claim is the allegation that Nissen's trial testimony against him was perjured. Specifically, Lotter alleged in his motion that Nissen "testified falsely that it was [Lotter] who conceived the idea of killing Lambert, Brandon, and DeVine, and that [Lotter] shot all three of them." The fact that Nissen was lying at trial would presumably have been known to Lotter at the time of the trial, and this issue was previously the subject of motions for a new trial, writ of error coram nobis, and postconviction relief. But Lotter points out that this is his first opportunity to actually prove the perjury by virtue of Nissen's partial recantation. Lotter argues that the use of the perjured testimony at his trial violated due process of law and that his convictions and sentences should be rendered void.

(a) Prosecutorial Misconduct
[7] We first address Lotter's assertion that his right to a fair trial was violated because, at the time of trial, the State knew or should have known that Nissen's testimony was perjured. A fair trial before a fair and impartial jury is a basic requirement of constitutional due process guaranteed by the Constitutions of the United States and the State of Nebraska.[29]
[8, 9] Where the testimony is in any way relevant to a case, the knowing use of perjured testimony by the prosecution deprives a criminal defendant of his or her right to a fair trial.[30] Also, when the reliability of a given witness may be determinative of guilt or innocence, nondisclosure of evidence affecting credibility violates due process, irrespective of the good faith or bad faith of the prosecution.[31] For, if evidence probative of innocence is in the prosecutor's file, then the prosecutor should be presumed to recognize its significance even if he or she actually overlooked it.[32] The requirements of due process are not satisfied by mere notice and hearing if a state has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception.[33] And the nondisclosure of exculpatory evidence corrupts the truth-seeking function of the trial process and helps shape a trial that bears heavily on the defendant.[34]
But in this case, the recently discovered recantation by Nissen is in no way probative of whether the State knew or should have known Nissen's testimony was perjured at the time of Lotter's trial or whether it failed to disclose exculpatory evidence with regard to Nissen's testimony. In fact, Lotter's allegation that the State knew or should have known of Nissen's perjury at the time of trial stems not from the recantation affidavit, but from information known to the State that Nissen had lied several times in the past and had refused the State's request that he take a lie detector test before testifying.
The problem is that Lotter fails to allege that this evidence was unavailable before any of the numerous challenges already made to his convictions and sentences. None of the facts alleged in the current motion could prove the State knowingly used perjured testimony against Lotter. And, even assuming that a due process claim can rest on the State's negligent failure to know that testimony is perjured,[35] Lotter is procedurally barred from raising his current allegations.
[10-12] The need for finality in the criminal process requires that a defendant bring all claims for relief at the first opportunity.[36] Therefore, it is fundamental that a motion for postconviction relief cannot be used to secure review of issues which were known to the defendant and could have been litigated on direct appeal.[37] Similarly, an appellate court will not entertain a successive motion for postconviction relief unless the motion affirmatively shows on its face that the basis relied upon for relief was not available at the time the movant filed the prior motion.[38] On its face, Lotter's motion for postconviction relief failed to affirmatively show that he could not have raised these issues either on direct appeal or during prior motions for new trial and postconviction relief.

(b) Perjury Per Se
We next address Lotter's claim that the mere presence of perjured testimony, regardless of the State's knowledge that it was perjured, violated his rights to due process. Since this is the first time that admissible evidence is available regarding Nissen's recantation, such a claim is arguably not procedurally barred. However, we hold that Nissen's recantation, even if proved true, does not present a constitutional claim amendable to postconviction relief. Therefore, postconviction relief on this basis was properly denied without an evidentiary hearing.
[13, 14] Perjury per se is not a ground for collateral attack on a judgment. The guilt or innocence determination in a procedurally fair trial is "`a decisive and portentous event.'"[39] The Due Process Clause guarantees a procedurally fair trial, but does not guarantee that the verdict will be factually correct.[40] The U.S. Supreme Court, while holding that affirmative prosecutorial involvement in perjured testimony may interfere with the fairness of the trial process,[41] has never held that the prosecution's unknowing reliance at trial on perjured testimony violates any constitutional right.[42]
Other courts, more directly confronted with the issue, have concluded that perjury itself, absent prosecutorial misconduct surrounding the perjury, does not constitute an independent constitutional claim.[43] For instance, the court in Luna v. Beto[44] rejected the defendant's claim that a conviction on perjured testimony was a constitutional violation even absent state complicity, explaining that the unknowing use of perjured testimony is simply an evidentiary mistake. In Luna v. Beto, the court stated:
[F]or an otherwise valid state conviction to be upset years later on federal habeas, surely something more than an evidentiary mistake must be shown. If mistake is enough, then never, simply never, will the process of repeated, prolonged, postconviction review cease. For in every trial, or at least nearly every trial, there will be, there are bound to be, some mistakes.[45]
We agree. A defendant has a due process right to a trial process in which the truth-seeking function has not been corrupted. But it is axiomatic that the truth-seeking process is not defective simply because not all evidence weighed by the trier of fact was actually true. The protections of a "fair trial" granted the defendant in the criminal process are there precisely because some of the evidence against the defendant may be disputed.
Lotter relies on Ortega v. Duncan,[46] wherein the U.S. Court of Appeals for the Second Circuit held that regardless of prosecutorial knowledge of the perjury, due process is violated when a court is left with the firm belief that but for a witness' perjured testimony, the defendant would most likely not have been convicted. In Ortega v. Duncan, the defendant was granted habeas relief when a key witness placing the defendant at the scene of the murder later recanted.
The majority of the federal circuits, however, reject the Second Circuit's conclusion that affirmative prosecutorial involvement is not a necessary element of a due process violation based on perjured testimony.[47] While some state courts allow such a claim, many do so under postconviction relief statutes that do not limit relief to constitutional claims rendering the judgment void or voidable.[48]
[15, 16] In Nebraska, postconviction relief is strictly prescribed. In a different statute, the Legislature has provided defendants with the ability to file a motion for new trial based on newly discovered evidence showing that the defendant was wrongfully convicted.[49] Unlike postconviction relief, relief under § 29-2103 is not strictly limited to constitutional claims. But a motion under § 29-2103 must be filed within 3 years of the date of the verdict.[50] We have repeatedly held that a motion for postconviction relief cannot be used to obtain, outside of the 3-year time limitation, what is essentially a new trial based on newly discovered evidence.[51] This can be no less true for a recently discovered recantation than for any other newly discovered evidence material to the defendant. It has been said that there is no form of proof so unreliable as recanting testimony.[52] "`The opportunity and temptation for fraud are so obvious that courts look with suspicion upon such an asserted repudiation of the testimony of a witness for the prosecution, and this is so even though the repudiation be sworn to.'"[53]
"`Society's resources have been concentrated at [the time of trial] in order to decide, within the limits of human fallibility, the question of guilt or innocence of one of its citizens.'"[54] We will not set aside that decision more than a decade after it was made based only on the recent recantation of some portion of a key witness' testimony against Lotter. The 3-year limitation of § 29-2103 reflects the fact that with the passage of time and the erosion of memory and the dispersion of witnesses, there is no guarantee that the truth-seeking function of a new trial would be any more exact than the first trial.[55] We do not grant postconviction relief in the absence of a constitutional violation, and the presence of perjury by a key witness does not, in and of itself, present a constitutional violation.

(c) Actual Innocence
[17] Nevertheless, in State v. El-Tabech,[56] it was observed that in the "rare case of actual innocence," there might be a claim that the continued incarceration of such an innocent person, without affording an opportunity to present newly discovered compelling evidence, is a denial or infringement of a constitutional right that would render the judgment void or voidable. The U.S. Supreme Court, in Herrera v. Collins,[57] while noting the "elemental appeal" of the premise that the constitution prohibits the execution of an innocent person, concluded that such execution was not an independent Constitutional violation. However, the Court recognized that it was not actually presented with the "truly persuasive demonstration of `actual innocence,'"[58] which, assuming any such constitutional claim could exist, would be required. For, the Court explained, once a defendant has been afforded a fair trial and convicted of the offense for which the defendant was charged, the presumption of innocence disappears.[59]
[18] Since Herrera, some state courts have held that deprivation of life or liberty, in the face of persuasive evidence of the person's actual innocence, violates fundamental concepts of either procedural or substantive due process of law.[60] But we need not decide in this case whether and how a claim of actual innocence is cognizable under Nebraska's postconviction relief statutes, because Nissen's recantation fails to present an issue of Lotter's actual innocence. According to Lotter, Nissen's affidavit proves he lied about who fired the shots that killed the victims and who "conceived" the idea of killing them. But even if a defendant has not actually killed a victim, substantial participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the constitutional culpability requirement for a conviction of first degree murder[61] and to support a constitutional application of the death penalty.[62]
Nothing in the allegations presented by the postconviction motion, even if true, refutes the evidence at trial that Nissen and Lotter, wearing gloves, traveled to Lambert's house in order to kill Brandon and anyone else they found there. The recantation does not refute the evidence that Lotter stole the gun used to murder the victims and that Lotter obtained the knife and the gloves worn during the crimes. It does not refute the testimony of a witness that on the evening of the murders, Lotter told the witness he desired to kill someone and that after the murders, Lotter sought to obtain an alibi. As we indicated in Lotter's appeal from the denial of his motion for DNA testing,[63] because of the joint participation in the felony and the reckless indifference to human life, it is irrelevant to the degree of culpability by whose hand the victims actually died. And certainly, determination of this question does not make a showing of actual innocence of the crimes for which Lotter was convicted and sentenced. As such, postconviction relief based upon Nissen's recent recantation was properly denied without an evidentiary hearing.

2. COERCION BY THREAT OF ELECTROCUTION
Finally, Lotter alleges that he should have been granted postconviction relief, because Nissen's testimony against him was coerced by the threat of death by electrocution. In this regard, Lotter argues that there are no issues of fact in dispute and that the court simply should have granted postconviction relief with or without an evidentiary hearing.
[19] It is prosecutorial misconduct and a violation of a defendant's due process right to a fair trial to obtain testimony through violence.[64] Recently, in State v. Mata, we considered evolving standards of decency and concluded that death by electrocution resulted in "`unnecessary pain, suffering, and torture' for some condemned prisoners" and was unconstitutional.[65] Lotter derives from this that Nissen's testimony pursuant to a plea bargain, wherein the State agreed not to pursue the death penalty (at that time, through electrocution), was unconstitutionally coerced by the threat of torture.
[20, 21] A witness' testimony is not the result of unconstitutional coercion simply because it is motivated by a legitimate fear of a death sentence.[66] True promises of leniency are not proscribed when made by persons authorized to make them.[67] Thus, it is permissible for the State to make promises of immunity or pardon to witnesses in return for testimonial confessions and to make promises of reduced charges or reduced sentences tendered to defendants and potential defendants by plea bargains in return for judicial admission of guilt.[68] At the time of Nissen's plea agreement with the State, death by electrocution was considered constitutional[69] and the State's promise not to pursue that punishment was thus a legitimate promise of leniency. And, at trial, Lotter was permitted to thoroughly crossexamine Nissen regarding his motivation to testify against him, including his fear of death by electrocution. We find no merit to Lotter's argument that Nissen's testimony was unconstitutionally coerced.

VI. CONCLUSION
Even if we assume the allegations of Lotter's second motion for postconviction relief are true, he has failed to present any claim that is not procedurally barred and which presents a constitutional violation rendering the judgment against him void or voidable. Therefore, the district court did not err in denying relief without an evidentiary hearing.
AFFIRMED.
WRIGHT and MILLER-LERMAN, JJ., not participating.
NOTES
[1] See State v. Nissen, 252 Neb. 51, 560 N.W.2d 157 (1997).
[2] State v. Lotter, 266 Neb. 758, 771, 669 N.W.2d 438, 448 (2003). See, also, Neb. Rev. Stat. § 29-2523(1)(b) (Reissue 2008).
[3] State v. Lotter, supra note 2, 266 Neb. at 771, 669 N.W.2d at 448. See, also, § 29-2523(1)(e).
[4] See id.
[5] State v. Lotter, supra note 2, 266 Neb. at 771, 669 N.W.2d at 448. See, also, § 29-2523(1)(h).
[6] State v. Lotter, supra note 2, 266 Neb. at 772, 669 N.W.2d at 449.
[7] State v. Lotter, 255 Neb. 456, 586 N.W.2d 591 (1998), modified on denial of rehearing 255 Neb. 889, 587 N.W.2d 673 (1999).
[8] State v. Lotter, 266 Neb. 245, 252, 664 N.W.2d 892, 902 (2003).
[9] See Neb. Rev. Stat. § 27-804(2)(c) (Reissue 2008).
[10] State v. Lotter, supra note 8.
[11] See Neb. Rev. Stat. § 29-4116 et seq. (Reissue 2008).
[12] See State v. Lotter, supra note 2.
[13] See § 29-4120.
[14] State v. Lotter, supra note 2, 266 Neb. at 773, 669 N.W.2d at 449.
[15] See id.
[16] Ortega v. Duncan, 333 F.3d 102 (2d Cir. 2003).
[17] Brown v. Mississippi, 297 U.S. 278, 56 S. Ct. 461, 80 L. Ed. 682 (1936).
[18] State v. Mata, 275 Neb. 1, 745 N.W.2d 229 (2008).
[19] State v. Sims, 277 Neb. 192, 761 N.W.2d 527 (2009).
[20] State v. Parker, 276 Neb. 661, 757 N.W.2d 7 (2008).
[21] See State v. Stewart, 242 Neb. 712, 496 N.W.2d 524 (1993).
[22] Neb. Rev. Stat. § 29-3001 et seq. (Reissue 2008).
[23] § 29-3001.
[24] See, State v. Harris, 274 Neb. 40, 735 N.W.2d 774 (2007); State v. Ryan, 257 Neb. 635, 601 N.W.2d 473 (1999).
[25] State v. Murphy, 15 Neb. App. 398, 727 N.W.2d 730 (2007). See, also, Danforth v. Minnesota, ___ U.S. ___, 128 S. Ct. 1029, 169 L. Ed. 2d 859 (2008); State v. Shepard, 208 Neb. 188, 302 N.W.2d 703 (1981); State v. Whited, 187 Neb. 592, 193 N.W.2d 268 (1971); State v. Reizenstein, 183 Neb. 376, 160 N.W.2d 208 (1968).
[26] State v. Dean, 264 Neb. 42, 645 N.W.2d 528 (2002).
[27] Id.
[28] § 29-3001. See, also, State v. Dean, supra note 26; State v. Sims, supra note 19.
[29] U.S. Const. amend. XIV, § 1; Neb. Const. art. I, § 11. See, also, State v. Boppre, 243 Neb. 908, 503 N.W.2d 526 (1993); State v. Menuey, 239 Neb. 513, 476 N.W.2d 846 (1991); Simants v. State, 202 Neb. 828, 277 N.W.2d 217 (1979).
[30] Napue v. Illinois, 360 U.S. 264, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959). See, also, United States v. Agurs, 427 U.S. 97, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976); Alcorta v. Texas, 355 U.S. 28, 78 S. Ct. 103, 2 L. Ed. 2d 9 (1957); Mooney v. Holohan, 294 U.S. 103, 55 S. Ct. 340, 79 L. Ed. 791 (1935); State v. Ford, 187 Neb. 353, 190 N.W.2d 787 (1971).
[31] See, Giglio v. United States, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972); Napue v. Illinois, supra note 30.
[32] United States v. Agurs, supra note 30; Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). See, also, State v. Boppre, supra note 29.
[33] United States v. Agurs, supra note 30.
[34] See Mooney v. Holohan, supra note 30. See, also, United States v. Agurs, supra note 30; Brady v. Maryland, supra note 32.
[35] See, U.S. v. Perkins, 94 F.3d 429 (8th Cir. 1996); People v. Cornille, 95 Ill. 2d 497, 448 N.E.2d 857, 69 Ill. Dec. 945 (1983). See, also, Giglio v. United States, supra note 31. But see Smith v. Black, 904 F.2d 950 (5th Cir. 1990), abrogated on other grounds, Stringer v. Black, 503 U.S. 222, 112 S. Ct. 1130, 117 L. Ed. 2d 367 (1992).
[36] State v. Sims, supra note 19.
[37] State v. Ryan, supra note 24.
[38] State v. Sims, supra note 19.
[39] Herrera v. Collins, 506 U.S. 390, 401, 113 S. Ct. 853, 122 L. Ed. 2d 203 (1993).
[40] Herrera v. Collins, supra note 39.
[41] See, e.g., Napue v. Illinois, supra note 30; United States v. Agurs, supra note 30; Alcorta v. Texas, supra note 30; Mooney v. Holohan, supra note 30.
[42] See Jacobs v. Scott, 513 U.S. 1067, 115 S. Ct. 711, 130 L. Ed. 2d 618 (1995) (Stevens, J., dissenting from denial of certiorari; Ginsburg, J., joins).
[43] See, e.g., Black v. United States, 269 F.2d 38 (9th Cir. 1959). See, also, Burks v. Egeler, 512 F.2d 221 (6th Cir. 1975).
[44] Luna v. Beto, 395 F.2d 35 (5th Cir. 1968).
[45] Id. at 40 (Brown, C.J., concurring specially; Gewin, Bell, Thornberry, Coleman, Ainsworth, Simpson, and Clayton, Circuit Judges, join).
[46] Ortega v. Duncan, supra note 16.
[47] See, Smith v. Gibson, 197 F.3d 454 (10th Cir. 1999); Reddick v. Haws, 120 F.3d 714 (7th Cir. 1997); Jacobs v. Singletary, 952 F.2d 1282 (11th Cir. 1992); Smith v. Black, supra note 35; Stockton v. Com. of Va., 852 F.2d 740 (4th Cir. 1988); Burks v. Egeler, supra note 43; White v. Hancock, 355 F.2d 262 (1st Cir. 1966); United States v. Maroney, 271 F.2d 329 (3d Cir. 1959); Pina v. Cambra, 171 Fed. Appx. 674 (9th Cir. 2006); Billman v. Warden, 197 Md. 683, 79 A.2d 540 (1951).
[48] See, e.g., In re Carpitcher, 47 Va. App. 513, 624 S.E.2d 700 (2006); State v. Workman, 111 S.W.3d 10 (Tenn. Crim. App. 2002); Downes v. State, 771 A.2d 289 (Del. 2001).
[49] Neb. Rev. Stat. § 29-2103 (Reissue 2008).
[50] Id. See State v. El-Tabech, 259 Neb. 509, 610 N.W.2d 737 (2000).
[51] See, id.; State v. Dabney, 183 Neb. 316, 160 N.W.2d 163 (1968).
[52] People v. Shilitano, 218 N.Y. 161, 112 N.E. 733 (1916). See, also, Dobbert v. Wainwright, 468 U.S. 1231, 105 S. Ct. 34, 82 L. Ed. 2d 925 (1984) (Brennan, J., dissenting; Marshall, J., joins); Hysler v. Florida, 315 U.S. 411, 62 S. Ct. 688, 86 L. Ed. 932 (1942).
[53] Fout v. Commonwealth, 199 Va. 184, 192, 98 S.E.2d 817, 823 (1957).
[54] Herrera v. Collins, supra note 39, 506 U.S. at 401.
[55] See id.
[56] State v. El-Tabech, supra note 50, 259 Neb. at 529, 610 N.W.2d at 750 (Gerrard, J., concurring).
[57] Herrera v. Collins, supra note 39, 406 U.S. at 398.
[58] Id., 406 U.S. at 417.
[59] See id.
[60] See, e.g., In re Bell, 42 Cal. 4th 630, 170 P.3d 153, 67 Cal. Rptr. 3d 781 (2007); People v. Washington, 171 Ill. 2d 475, 665 N.E.2d 1330, 216 Ill. Dec. 773 (1996).
[61] See Enmund v. Florida, 458 U.S. 782, 102 S. Ct. 3368, 73 L. Ed. 2d 1140 (1982).
[62] Tison v. Arizona, 481 U.S. 137, 107 S. Ct. 1676, 95 L. Ed. 2d 127 (1987); State v. Bjorklund, 258 Neb. 432, 604 N.W.2d 169 (2000); State v. Ryan, supra note 24.
[63] State v. Lotter, supra note 2.
[64] Davis v. North Carolina, 384 U.S. 737, 86 S. Ct. 1761, 16 L. Ed. 2d 895 (1966); Brown v. Mississippi, supra note 17.
[65] State v. Mata, supra note 18, 275 Neb. at 65, 745 N.W.2d at 277.
[66] Poindexter v. Wolff, 403 F. Supp. 723 (D. Neb. 1975). See, also, U.S. v. Vest, 125 F.3d 676 (8th Cir. 1997).
[67] People v. Andersen, 101 Cal. App. 3d 563, 161 Cal. Rptr. 707 (1980).
[68] Id.
[69] State v. Ryan, supra note 24.